UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WARREN ENVIRONMENTAL INC., A&W MAINTENANCE, INC. Plaintiffs, <br><br> vs. <br><br> PROFESSIONAL SERVICE INDUSTRIES, INC. Defendant | } } } } } } } } } } } } } <br><br> C.A. #05-11642-DPW |

PROFESSIONAL SERVICE INDUSTRIES, INC'S MEMORANDUM
IN SUPPORT OF ITS MOTION FOR CHANGE OF VENUE

### Introduction

The diversity action arises out of a sewer reconstruction project in Jefferson County,

Alabama. The plaintiff, A&W Maintenance Inc. ("A&W") and Warren Environmental Inc.

("Warren") are Massachusetts corporations. Professional Services Industries, Inc. ("PSI") is a

Delaware corporation with a principal place of business in Oakbrook Terrace, Illinois and a

principal place of business in Birmingham , Alabama. PSI's laboratory in Birmingham,

Alabama performed all the testing at issue in this lawsuit. The plaintiffs' allege that PSI

negligently tested voluminous epoxy samples from the Jefferson County sewer project which

resulted in A&W being terminated from the project. Warren manufactured the epoxy used by

A&W on the project. A&W further alleges that PSI breached it contract with Jefferson County

and that A&W was a third party beneficiary of that contract. A&W further alleges that PSI

interfered with A&W'S advantageous relationship with Jefferson County. A&W and Warren

allege that PSI's test results to Jefferson County were false and constitute libel. A&W and

Warren further allege that PSI's reporting of the test results to Jefferson County constitute Mass. G.L. c 93a violations.

Virtually, all of the events which give rise to this lawsuit occurred in Alabama. Most of the witnesses who could be expected to testify at the trial of this case are Alabama residents, who would be unavailable to testify at a trial in Massachusetts. These include numerous former PSI employees who were involved in the testing at issue, all Jefferson County employees who were involved in the hiring, firing, and rehiring of A&W/Warren; numerous US Infrastructure, Inc. (the project engineers) employees who oversaw the work, constructed the "product samples" for testing by PSI and who worked in conjunction with PSI on this project; various Rast Construction employees who mixed and poured the "product samples" at issue as well as all of the members of the Jefferson County Product Review Committee which made the decision to approve, disapprove, and then re-approve Warren's product for use on the sewer project. The PSI testing documents at issue in this case are in Alabama. The Jefferson County documents concerning the sewer project are in Alabama. The enormous laboratory equipment used to conduct the tests is in Alabama. At the trial of this matter PSI would request that the jury have a view of the laboratory equipment and the manner in which it operates.

For the convenience of the witnesses and the interest of justice this case should be transferred to the United States District Court of Alabama. Absent a transfer of this case to Alabama, a jury would be deprived of the live testimony of voluminous fact witnesses who could be expected to testify at trial.

Transferring the case to Alabama would allow the trier of fact to view the live testimony of the more than thirteen non-party Alabama residents who would be expected to be called as witnesses at the trial of this matter. Further, an Alabama jury would have the opportunity to

view the operation of the testing equipment at PSI's laboratory in Alabama which was used to test the "product samples" from the sewer project.

Finally, venue in Alabama is proper pursuant to 28 U.S.C. §1391 given that a substantial part of the events giving rise to this lawsuit arose in Alabama.

## Facts

The below facts are referenced in the Affidavit of Brian P. Voke filed along with the Motion and Memorandum.

On May 29, 1998 Jefferson County Alabama and PSI through it's Birmingham, Alabama office entered into a contract for PSI to provide construction materials testing for the Cahaba River and Village Creek Sewer Rehabilitation Construction Project. "The Project" See Contract Attached as Exhibit 1.

The contract, executed in Birmingham, Alabama, called for PSI's Birmingham Alabama laboratory to perform strength testing on approximately 200 cured in place pipe liner samples installed by A&W. The contract also required PSI to perform strength testing of 600 spray applied urethane resistant epoxy based manhole liner samples installed by A&W.

The contract required PSI to perform testing in an effort to verify compliance with Jefferson County's specified standards and various contract documents. The contract also called for PSI to notify Jefferson County, US Infrastructure, Inc. ("US") (the project engineer) and the contractor of observed irregularities or deficiencies in the work products or materials.

Finally, the contract required PSI to provide Jefferson County, US, and the contractor written reports containing among other information test results and compliance or lack thereof with the contract documents. When requested by Jefferson County or US, PSI was contractually

3

required to provide their interpretation of the test results. PSI performed testing on project samples from 1998 until sometime in 2002.

In October 2005, A&W and Warren commenced suit against PSI asserting claims for negligence, libel, third party beneficiary breach of contract, interference with advantageous relations and violations of Mass. G.L. c. 93A.

Plaintiffs allege that PSI negligently tested the A&W's application of the Warren product applied at the Jefferson County manhole rehabilitation project and that A&W was terminated from the project as a result of PSI's negligence. Plaintiffs further allege that PSI's testing of the sewer project samples was so grossly negligent and/or intentionally designed to fail the project samples, that it constitutes an unfair and deceptive trade practice in violation of Mass. G.L. c. 93A.

The plaintiffs' libel claim alleges that PSI knew its test results for the project were false and that PSI reported the false test results to Jefferson County. The plaintiffs further contend that A&W was a third party beneficiary of Jefferson County's contract with PSI and that PSI breached that contract by conducting faulty tests on the project samples. A&W's interference with advantageous business relations claim alleges that PSI was grossly negligent and/or intentionally failed the project samples and thus interfered with A&W's contract with Jefferson County. PSI denies all of the plaintiffs' claims.

### Likely Trial Witnesses

Without having conducted any formal discovery PSI has identified the following as witnesses whose testimony could be expected at the trial of this matter.

### Non-Party Witnesses

1.      Jonathan Igo – former PSI employee, Alabama resident;

2.    Johnny Woods – former PSI manager, Alabama resident;

3.    John Willet – employee of US Infrastructure, Inc. – project engineers, Alabama

resident;

4.    Jim McCrae – former PSI manager, Alabama resident;

5.    Jim Peques – former PSI manager, Alabama resident;

6.    Ronald Wilson – project manager for Jefferson County, Alabama; on information

and belief he is an Alabama resident;

7.    Guy Locker – Jefferson County Alabama Product Review Committee.  On

information and belief he is an Alabama resident;

8.    Harry Chandler – Jefferson County Alabama Product Review Committee.  On

information and belief he is an Alabama resident;

9.    Donald Ellis - Jefferson County Alabama Product Review Committee.  On

information and belief he is an Alabama resident;

10.    Seth Hammer – former employee of U.S. Infrastructure, Inc. the product engineers.

On information and belief he is an Alabama resident;

11.    Tim Tucker – former employee of U.S. Infrastructure, Inc. the product engineers.

The last information available was that he was an Alabama resident;

12.    Danny Homes – was employed by U.S. Infrastructure, Inc. as an inspector.  On

information and belief he is an Alabama resident;

13.    John Bailey – was employed by U.S. Infrastructure, Inc. as an inspector.  On

information and belief he is an Alabama resident;

14.    Tim Patton - was employed by U.S. Infrastructure, Inc. as an inspector.  On

information and belief he is an Alabama resident;

15.  Haley Rast Construction - 2901 Shannon- Oxmoo Road, Birmingham, Alabama.

Contractor on the project doing the actual application to the sewer system.

**PSI anticipates calling the following residents of Alabama as non-party witnesses at the trial of this matter.**

**Jonathan Igo**
**Birmingham, Alabama**

Mr. Igo is a former employee of PSI and a current resident of Alabama. As the project manager for PSI, he performed and supervised testing on the Warren "product samples" from the Jefferson County project and signed many of the PSI testing reports. Mr. Igo is expected to testify relative to PSI's testing methods and procedures used to test the "product samples". He is also expected to testify that the testing of the "product samples" was done according to ASTM standards. He is further expected to testify that PSI verified the results it obtained in testing of Warren "product samples" by comparing those results with other products PSI tested. He is further expected to testify that PSI's test procedures and methods were consistently reliable and accurate. He is further expected to testify that a number of the "product samples" provided to PSI did not meet Jefferson County's product specifications. He is further expected to testify that after Warren's "product samples" failed to comply with contract documents, Jefferson County representatives asked A&W/Warren to lower the claims they made relative to the strength of the product. Mr. Igo is further expected to testify that PSI testing was reliable and was not faulty as claimed by the plaintiffs. Mr. Igo also can be expected to testify that the laboratory equipment used to perform the testing was properly calibrated.

### Jim MaCrae
### Birmingham, Alabama

Mr. MaCrae, a former PSI employee, was employed as a manager of PSI's laboratory and metallurgical service in Alabama from March 2001 until April, 2003. Mr. McCrae is a resident of Alabama. Mr. MaCrae is expected to testify as to the type of "product samples" received and tested, the manner in which the "product samples" were poured, the methods and procedures used to test the "product samples" and his review of the test results for the "product samples". Mr. MaCrae is expected to testify that PSI testing of the Warren "product samples" from the Jefferson County Project was performed according to ASTM standards D638 and D790.

He is further expected to testify that in 2002 he reviewed PSI's testing procedures and methods and determined they complied with the ASTM specifications, with the exception that total elongation instead of elongation at yield or break was historically reported per Jefferson County's approval. Mr. MaCrae is further expected to testify that PSI's test results on the Warren "project samples" were reliable and were not false as claimed by the plaintiffs. Mr. MaCrae is further expected to testify that PSI's testing of the Warren "product samples" showed that a high percentage of the test samples failed to meet product requirements. He is further expected to testify that PSI's test results from the Warren "product samples" were compared to PSI's test results for other manufacturer's products and were determined to be reliable. He is further expected to testify that PSI performed its obligations to Jefferson County under the contract at issue in this case.

### Johnny Woods
### Birmingham Alabama

Mr. Woods is a former employee of PSI. He was employed as the department manager of PSI's Birmingham laboratory from October 1997 - December 1999. As the department

manager, Mr. Woods performed and supervised testing on the "product samples" from the Jefferson county project. Mr. Woods is expected to testify relative to the PSI's testing methods and procedures used to test the "product samples". He is expected to testify that the testing of the "product samples" was done according to ASTM standards. He is further expected to testify that PSI's test results from the Warren "product samples" were compared to PSI's test results for other manufacturer's products and were determined to be reliable. He is further expected to testify that PSI's test procedures and methods were reliable and accurate.

He is further expected to testify that Warren "product samples" supplied by A&W on the Jefferson County sewer project failed to comply with the contract documents and contract specifications. Mr. Woods is further expected to testify that PSI's testing was not faulty and was not wrong as claimed by the plaintiff. Mr. Woods can be expected to testify as to the reliability of the equipment used to perform the testing and the reliability of the test results received. He is further expected to testify that PSI never told anyone about the test results of Warren's products other than A&W/Warren, Jefferson County and U.S. Infrastructure, Inc. He is further expected to testify that PSI fulfilled its contract obligations to Jefferson County. Mr. Woods currently resides in Alabama.

### Jim Peques
### Birmingham, Alabama

Mr. Peques is a resident of Alabama and a former employee of PSI. He was an engineer at PSI's Alabama office which performed the testing at issue. Mr. Peques could be expected to testify that he reviewed the manner in which PSI's tests of the Warren/A&W "product samples" were interpreted, tracked and calculated for their reliability.

### John Willet
### Birmingham, Alabama

Mr. Willet is a resident of Alabama and an employee of U.S. Infrastructure, Inc., ("U.S.") the project engineer for the Jefferson County sewer reconstruction project. PSI expects that Mr. Willet would testify that he was a member of the Jefferson County Project Review Committee from 1997 through the present; that in June 1997 the committee gave provisional approval to the Warren epoxy product; that in July 2002 the committee disapproved the product after the "product samples" submitted to U.S. by A&W/Warren for testing by PSI, failed to meet the project specifications. The committee reinstated the Warren product after the Committee met with Warren and concluded that the low test results obtained was the result of the manner in which A&W/Warren was creating the "product samples" for testing by PSI. Mr. Willet is further expected to testify that he is familiar with PSI's testing of the "product samples" at issue and PSI fulfilled it contract obligations with Jefferson County. PSI did not breach its contract with Jefferson County. Willet is further expected to testify that there was nothing faulty about PSI's testing methods.

### John Bailey, Tim Patton and Danny Homes

John Bailey, Tim Patton and Danny Homes were inspectors employed by the U.S. in Alabama. PSI expects these witnesses to testify as to the method of creating the configurations, the physical condition and the method of transporting the "product samples" from A&W on the job site to the PSI laboratory for testing.

### Jefferson County Employees

PSI also expects to call Jefferson County Commission officials to testify as to their reasons for terminating A&W's contract and the information they received from Warren which resulted in the rehiring of A&W on the Jefferson County Sewer Reconstruction Project. PSI also

expects to call Jefferson County representatives as witnesses to testify that PSI fulfilled it

contract obligations.

### Seth Hammer
### Birmingham, Alabama

Mr. Hammer was an employed at U.S. Infrastructure, Inc. and worked closely with PSI

on the Jefferson County Project.  PSI expects that Mr. Hammer would testify that PSI compiled

with its contractual obligations to Jefferson County relative to the testing PSI contracted to

perform.  Mr. Hammer reportedly lives in Alabama.

### Tim Tucker
### Alabama

Mr. Tucker was employed by U.S. Infrastructures, Inc. in Birmingham, Alabama and

worked with PSI on the Jefferson County Project.  PSI expects Mr. Tucker would testify that he

came to PSI's laboratory on behalf of Jefferson County to inspect PSI's testing and procedure

after Warren's complaints about PSI's testing.  Mr. Tucker could further be expected to testify

that after reviewing PSI's testing and procedure he had no complaints or concerns about PSI's

testing methods. The last available information was that he lived in Alabama.

### Haley Rast Construction ("Haley")
### Birmingham, Alabama

Haley was a contractor on the project associated with A&W and doing the actual epoxy

application on the sewer system.  Haley poured the "product samples" that were given to U.S.

Infrastructure, Inc. and then sent to PSI for testing.  PSI expects that Haley will describe the

manner in which they prepared the "product samples" which U.S. Infrastructure, Inc. (through

John Willet) determined were too brittle and thus failed to pass the county testing specifications

to which PSI tested the "product samples".

### Jefferson County Products Review Committee

Don Ellis, Guy Locker and Harry Chandler who were Alabama residents were on the product review committee which approved, disapproved and re-approved Warren's epoxy product. PSI expects that these witnesses would testify at trial, consistent with John Willet's testimony, as to the reason that Warren's product was removed from Jefferson County's product approved list and reinstated in 2002. On information and belief, Guy Locker and Harry Chandler are Alabama residents. The last information regarding Don Ellis is that he lived in Alabama.

### Ronald Wilson

Ronald Wilson was the project manager for Jefferson County, Alabama for the manhole rehabilitation project. PSI expects him to testify that PSI complied with its contractual obligations to Jefferson County Alabama. Based upon information and belief he is an Alabama resident.

### The Laboratory Equipment

PSI tested the "product samples" on a machine called a SATECM120 HVL. The machine is approximately 8 feet tall, 3-4 feet square and is estimated to weigh 1000 pounds. (See Affidavit of Brian P. Voke).

PSI anticipates that if the trial were in Alabama it would request a jury view of the testing machine to demonstrate the manner in which PSI tested the "product samples". This is extremely relevant given that the plaintiffs contend PSI negligently tested the "product samples".

### THE APPLICABLE LAW

28 U.S.C. §1404(a) provide as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. §1391 provides that:

> A civil action may be brought in "a judicial district in which substantial part of the event or omissions giving rise to the claim occurred..."

It is clear that from the plaintiffs' Complaint that this action might initially have been brought in Alabama, where PSI's allegedly tortious conduct occurred (See Plaintiffs' Complaint) See Van Dusen v. Barrack, 376 U.S. 612, 624 (1964) (action "might have been brought" wherever jurisdiction and venue are proper).

In a motion for a change of venue, the issue is whether, on balance, the convenience of parties and witnesses will be better served by a trial in Alabama rather than by one in Massachusetts. "The ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." Iragorri v. International Elevator, Inc., 203 F.3d 8, 12 (1st Cir. 2000), citing Koster v. (American) Lumbermens Mut. Cas. Co., 330 U.S. 518, 527 (1947).

"Section 1404(a) is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness." Wolverine Proctor & Schwartz, Inc. v. Aeroglide Corp., 394 F.Supp.2d 299 (D.Mass. 2005)(internal citations and quotations omitted). Accordingly, under this section "district courts were given more discretion to transfer...than they had to dismiss on grounds of forum non conveniens..." American Dredging Co. v. Miller, 510 U.S. 443, 449 (1994), citing Piper Aircraft Co. v. Reyno, 454 U.S. 235, 253 (1981). In weighing the applicable factors, courts are permitted to transfer a case "upon a lesser showing of inconvenience" than would be required for a dismissal under the doctrine of forum non conveniens. Norwood v. Kirkpatrick, 349 U.S. 29, 32 (1955).

"A decision of the district [court] regarding a transfer of venue in a civil action may only be overturned for an abuse of discretion" Cianbro Corp. v. Curran-Lavoie, Inc., 814 F.2d 7 (1st Cir. 1987) (internal citation omitted)

### Factors To Consider

The Supreme Court identified the following factors for a court to consider on a motion for change of venue.

> Considerations relevant to the litigants' private interests include 'the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947). In Gilbert, the Supreme Court stated that "to fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition, is to create a condition not satisfactory to court, jury or most litigants;" and the availability of compulsory process in a transferee district has continued to be of central importance to courts confronted with motions under §1404(a). Gilbert, 330 U.S. at 511; See, e.g., Harwich, 129 F. Supp. at 559 (D. Mass. 1955); Graphics Realty and Discount Co. v. Howe Fire and Marine Ins. Co. of California, 193 F. Supp. 421, 422 (D. Mass. 1961); See also Wright, Miller & Cooper, Federal Practice and Procedure §3851 at 420 (1986) ("There are frequent indications in the cases that what the courts are actually considering is not so much the convenience of witnesses but the possibility of having their testimony live at trial"). Moreover, the First Circuit has expressly held "that a court should procure live testimony of material non-party witnesses at trial rather than being forced to rely upon deposition evidence ...This is

especially so when the 'qualitative value' of the witnesses' testimony is high." Princess House, Inc. v. Lindsey, 136 F.R.D. 16, 20 (D.Mass. 1991)(internal citation and quotations omitted). In considering a motion for change of venue the plaintiffs' choice of forum, though given deference, is not dispositive particularly where there is little connection between that forum and the facts giving rise to the liability. Brant Point Corp. v. Poetzsch, 671 F. Supp. 2, 5 (D. Mass. 1987)("plaintiff's choice of forum alone is not controlling"). In Lowry v. Chicago, Rock Island and Pacific R. Co., 293 F. Supp. 867 (W.D. Okla. 1968), for example, a wrongful death action filed in Oklahoma was transferred to Kansas where the activity giving rise to the claim took place and where most witnesses resided.

> Where none of the conduct complained of occurred in the forum selected by the plaintiff, the deference due to freedom of the plaintiff to select his own forum has minimal value in determining whether the action should be transferred to another Federal District Court.

Id. at 868. See also Polaroid v. Casselman, 213 F. Supp. 379, 383 (S.D.N.Y. 1962). (Plaintiff's choice of forum only one factor to consider and given little weight where selected forum has little connection to subject matter of claim); Dicken v. U.S., 862 F. Supp. 91, 92-93 (D.Md. 1994) (internal citations omitted)("the plaintiff's choice of forum is given little weight when none of the conduct complained of occurred in the forum selected by the plaintiff and said forum has no connection with the matter in controversy"). See also New Medico Associates, Inc. v. Kleinhenz, 750 F. Supp. 1145 (D. Mass 1990); Harwich v. Atlantic Coast Line Railroad Co., 129 F. Supp.558, 559 (D. Mass 1995).

"Convenience of the expected witnesses is [p]robably the most important factor, and the factor most frequently mentioned." Princess House, Inc., 136 F.R.D. at 18 (citations and quotations omitted). See also Brant Point Corp., 671 F.Supp. at 3. This Court "must consider the number of potential witnesses located in both the transferor and the

transferee district, the nature and quality of their testimony, and whether the witnesses can be compelled to testify." Princess House, Inc., 136 F.R.D. at 18 (finding that the party moving for transfer shall specify the key witnesses to be called, accompanied by a general statement as to what their testimony will entail); Brant Point Corp., 671 F. Supp. at 3-4 (same).

A party is entitled to present its case live rather than by deposition. See, e.g., Subaru of New England, Inc. v. Subaru of Augusta, Inc., 121 F.R.D. 1,2 (D. Mass. 1998); Brant Point Corp. v. Poetzch, 671 F. Supp. 2, 4-5 (D. Mass. 1987); Graphics Realty and Discount Co., 193 F. Supp. at 422. Live testimony is especially important where significant issues of credibility have arisen. See, e.g., Subaru of New England, Inc. vs. Subaru of Augusta, Inc., 121 F.R.D. at 2; Poetzch, 671 F. Supp. At 3; Atlantic Coast Line Railroad Co., 129 F. Supp. at 559; See also Walter E. Heller & Co., v. James Godbe Co., 601 F. Supp. 319, 322 (N.D. Ill. 1984).

Where the bulk of documents and witnesses are located in the transferee forum, it is easier for the court to oversee litigation and the trial is made easier, more expeditious and less expensive by granting the motion to transfer. See Olin Corp. v. Fisons, 47 F. Supp. 2d 151, 158 (D. Mass. 1999) (All liability conduct, witnesses and documents in transferee forum favors forum non conveniens dismissal); Thomson Info. Services, Inc., 940 F. Supp. at 25 (D. Mass. 1996) (Documentary evidence relating to liability transactions in transferee forum favors transfer); F.A.I. Electronics Corp. v. Chambers, 944 F. Supp. 77, 81 (D. Mass. 1996). The ability to conduct a view is also an important consideration favoring transfer. Gilbert, 330 U.S. at 508; Fisons, 47 F. Supp. 2d at 158. See Dicken v. U.S., 862 F.Supp. 91, 94 (D.Md. 1994) (granting motion to transfer where the core issue in the case was the condition of a staircase-a fixed object which could not be readily transported to the plaintiff's selected forum).

The First Circuit also favors having the trial of a diversity case in a forum that is at home with the state law that governs the action. <u>Princess House, Inc.</u>, 136 F.R.D. at 22, <u>citing</u> <u>Van Dusen</u>, 376 U.S. at 645(citation omitted) (appropriateness in having trial of diversity case in forum home with state law governing action). <u>See also</u> <u>Brant Point Corp. v. Poetzsch,</u> 671 F. Supp. 2, 5 (D. Mass. 1987) ("North Carolina forum would promote the interests of justice by allowing the North Carolina zoning procedures at issue in this case to be construed by a federal court sitting in that state, rather than by a court unfamiliar with North Carolina law")(internal citations omitted).

## Argument

The interest of justice and the convenience of the witnesses weigh strongly in favor of transferring this action to Alabama where virtually all the activities which gave rise to this action occurred and where numerous non party witnesses reside. Massachusetts on the other hand has no connection with this case other than the fact that the plaintiffs are Massachusetts based corporations represented by Massachusetts lawyers.

PSI has identified as an initial matter fifteen non-party witnesses from Alabama who it expects to call at the trial of this matter. These non-party witnesses cannot be compelled to testify in Massachusetts. The ability of a jury to view the live testimony of these witnesses is essential for a fair and impartial trial. Further, discovery is almost certain to reveal the existence of additional trial witnesses from Jefferson County who have knowledge regarding the decision to disapprove and then re-approve the use of the Warren's epoxy product for use on the Jefferson County sewer project. The jury should have the benefit of their live testimony. The plaintiffs' contention that PSI negligently performed metallurgical tests in its Birmingham laboratory

renders the PSI laboratory equipment and the manner in which the equipment operates is extremely important to PSI's defense.

At the trial of this matter, PSI would request a jury view of the equipment and the manner in which it operates. Due to the size, shape, weight and current use of the equipment it could not be transported to Massachusetts for trial. Further, the equipment is still regularly used in PSI's laboratory.

The PSI test laboratory documents at issue in this case are all located in Alabama. Similarly, Jefferson County's documents concerning this sewer project are in Alabama along with U.S. Infrastructures, Inc.'s documents. Discovery and the trial of this matter will be best served if these documents and any witnesses needed to authenticate or explain any documents are within the subpoena power of the trial court. A trial in Alabama will make this possible while a trial in Massachusetts will not.

As far as the law is concerned, an Alabama court which is familiar with the public works bidding process in Alabama and Alabama tort law, would be in a better position to handle this case then a Massachusetts judge who is unfamiliar with such law.

Finally, it will be less expensive for the parties to prepare this case if it is transferred to Alabama where most of the fact witnesses reside, the laboratory equipment is located and the relevant documents are stored.

## CONCLUSION

For the above reasons, the Court should transfer this case to Alabama.

## CERTIFICATE OF SERVICE

I, Brian P. Voke, attorney for the defendant, Professional Services, Inc. hereby certify that I have served a copy on this _____ day of January 2006 of the above document upon the following party by first class mail and facsimile transmission.

Carlin J. Phillips, Esquire
Andrew J. Garcia, Esquire
PHILLIPS & GARCIA
13 Ventura Drive
N. Dartmouth, MA 02747

PROFESSIONAL SERVICES INC.
By its attorneys

Brian P. Voke, BBO#544327
CAMPBELL CAMPBELL EDWARDS
& CONROY
One Constitution Plaza
Boston, Massachusetts 02129

# JEFFERSON COUNTY COMMISSION



GARY WHITE - PRESIDENT
MARY M. BUCKELEW
BETTYE FINE COLLINS
JEFF GERMANY
CHRIS McNAIR

**CHRIS McNAIR — COMMISSIONER**
Environmental Services

Environmental Services Department
202-B Courthouse
Birmingham, Alabama 35263-0044
Telephone (205) 325-5801

July 27, 1999

Johnny C. Woods
Professional Service Industries, Inc.
2800 Commerce Square East
Irondale, AL 35210

RE:   **Amendment No. 1**
      **To The Agreement for Construction Materials Testing Services**
      **Cahaba River and Village Creek Sanitary Sewer Collection System Rehabilitation**

Dear Mr. Woods:

Please find enclosed one (1) copy of the above referenced Amendment No. 1 to the Agreement between Jefferson County and Professional Service Industries, Inc., for Construction Materials Testing Services to Cahaba River and Village Creek Sanitary Sewer Collection System Rehabilitation, which has been fully executed and approved by the Jefferson County Commission. Receipt of this letter should serve as your Notice-to-Proceed with the Scope of Work identified in the amendment.

Should you have any questions, please do not hesitate to give me a call.

Sincerely,

*Ronald K. Wilson /pd*

Ronald K. Wilson, P.E.
Project Manager

RKW/pd

Enclosure

cc:    File

RECEIVED
JUL 2 9 1999

G:\wilsonr\Cahaba&VillageCk Rehab\Amend.1.NTP.wpd

# AMENDMENT NO. 1
## TO THE
### AGREEMENT FOR
### CONSTRUCTION MATERIALS TESTING SERVICES
### CAHABA RIVER AND VILLAGE CREEK
### SANITARY SEWER COLLECTION SYSTEM REHABILITATION

This document shall AMEND the scope of the original AGREEMENT between Jefferson County, Alabama and Professional Service Industries (PSI), Inc. and identified as the **Agreement for Construction Materials Testing Services, Cahaba River and Village Creek Sanitary Sewer Collection System Rehabilitation** dated May 20, 1998 under the provisions of Article IV, Section 1, "Changes of Work".

## WITNESSETH:

WHEREAS, the COUNTY and the CONSULTANT have previously entered into an Agreement dated May 20, 1998 which provided for construction materials testing of sewer rehabilitation products in the Cahaba River and Village Creek sanitary sewer service areas; and

WHEREAS, the CONSULTANT is currently providing these services including minor changes; and

WHEREAS, the County now desires that the CONSULTANT drastically change his current method of obtaining "in situ" manhole rehabilitation samples; and

WHEREAS, the revised method of obtaining samples requires confined space entry into sanitary sewer manholes; and

WHEREAS, this type of entry was not provided for in the scope of the original Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants hereinafter stipulated to be kept and performed, it is agreed between the parties to amend the original agreement as follows:

1

## <u>ARTICLE III - PAYMENT</u>

Amend this section as follows:

For the additional work contemplated under this AGREEMENT, the contract amount shall be increased by $75,000.00 to an amount not to exceed $225,000.00.

Amend Attachment 1 to include the following unit prices:

- 3 Man crew with entry equipment for complete entry responsibilities.

    a.    Mobilization and setup, per manway  . . . . . . . . . . . . . $500.00
    b.    Bond Strength, per test  . . . . . . . . . . . . . . . . . . . . . . . $35.00
    c.    Standby or delay time, per hour . . . . . . . . . . . . . . . . . , $95.00

- 2 Man crew with entry equipment and holewatch by others

    a.    Mobilization and setup, per manway  . . . . . . . . . . . . . $200.00
    b.    Bond Strength, per test  . . . . . . . . . . . . . . . . . . . . . . . $35.00
    c.    Standby or delay time, per hour . . . . . . . . . . . . . . . . . . $60.00

Invoicing shall be in accordance with the original Agreement and Attachment 1 as amended.

G:\wilson\Cahaba&VillageCk Rehab\ConMatTestingAGR.wpd

JEFFERSON COUNTY COMMISSION
CAHABA RIVER & VILLAGE CREEK
MR. RONALD K. WILSON, P.E.

470-88248





**JEFFERSON COUNTY COMMISSION**

CHRIS McNAIR — COMMISSIONER
Environmental Services

Environmental Services Department
202-B Courthouse
Birmingham, Alabama 35263-0044
Telephone (205) 325-5801

MARY M. BUCKELEW - PRESIDENT
BETTYE FINE COLLINS
JEFF GERMANY
CHRIS MCNAIR
GARY WHITE

June 2, 1998

Mr. Johnny C. Woods
Department Manager
Professional Service Industries (PSI), Inc.
1025 South 23rd Street
Suite 204
Birmingham, AL 35205

RE:   **Construction Materials Testing Agreement**
      **Cahaba River and Village Creek Sanitary Sewer Collection System Rehabilitation**

Dear Mr. Woods:

Please find enclosed one (1) copy of the above referenced agreement between Jefferson County and Professional Service Industries (PSI), Inc. which has been fully executed and approved by the Jefferson County Commission. Receipt of this letter should serve as your Notice-to-Proceed with the Scope of Work identified in the agreement.

Should you have questions, please do not hesitate to give me a call.

Sincerely,

Ronald K. Wilson, P.E.
Project Manager

RKW/mo

Enclosure

C:\OFFICE\WPWIN\WPDOCS\HTP\JC98.NTP

AGREEMENT FOR
CONSTRUCTION MATERIALS TESTING SERVICES
CAHABA RIVER AND VILLAGE CREEK
SANITARY SEWER COLLECTION SYSTEM REHABILITATION

This AGREEMENT made this 2 day of _____, 1998, by and between Jefferson County, in the State of Alabama, as Party of the First Part, hereinafter referred to as the COUNTY, and PROFESSIONAL SERVICE INDUSTRIES, INC. (PSI), as Party of the Second Part, hereinafter referred to as the CONSULTANT.

WHEREAS, the said CONSULTANT has agreed and by these presents does agree with the COUNTY for consideration hereinafter mentioned with payment to be administered by the COUNTY to provide construction materials testing and assessments and to issue findings during the construction of the **Cahaba River and Village Creek Sanitary Sewer Collection System Rehabilitation.**

NOW THEREFORE, for and in consideration of the mutual covenants hereinafter stipulated to be kept and performed, it is agreed between the parties as follows:

## ARTICLE I - SCOPE OF WORK

The CONSULTANT, in the accomplishment of work under this AGREEMENT, shall provide for construction materials testing, assessments and inspections as requested by the County or USInfrastructure, Inc., hereinafter referred to as the PROJECT ENGINEER.

## SECTION 1 - OBLIGATION OF CONSULTANT TO COUNTY

The CONSULTANT will perform the following professional and engineering services:

1.  Perform strength testing of cured-in-place pipe liner samples including, but not limited to:

    a.    Flexural strength per ASTM D-790

    b.    Flexural modulus of elasticity per ASTM D-790

    c.    Tensile strength per ASTM D-638

    The County estimates that approximately 200 samples will be collected for testing.

1

C:\OFFICE\WPWIN\WPDOCS\AGRMNTS\CAHAVIL.WPD

2.   Perform strength testing of spray applied urethane resin and epoxy based manhole liner samples including, but not limited to:

    a.   Hardness per ASTM D-2240

    b.   Elongation per ASTM D-638

    c.   Bond strength per ASTM D-4541

    d.   Flexural strength per ASTM D-790

    e.   Flexural modulus per ASTM D-790

    f.   Density per ASTM D-1505

    g.   Tensile strength per ASTM D-638

    h.   Shrinkage per ASTM D-2566

The County estimates that approximately 600 samples will be collected for testing.

3.   Pick up all samples when requested by the Project Engineer and transport to appropriate location for testing.

4.   Cooperate with the County, the Project Engineer, and the Contractor during performance of the above services and provide qualified personnel for the project.

5.   Inspections, sampling, and testing of materials shall be performed in an effort to verify compliance with specified standards and contract documents.

6.   Promptly notify the County, the Project Engineer, and the Contractor of observed irregularities or deficiencies in the work, products, or materials.

7.   Promptly submit written reports of each test and inspection; copy each to the designated personnel of the County, the Project Engineer, and the Contractor, and one copy to Record Documents File. Each report shall include:

    a.   Date issued.

    b.   Project title and Contract Number.

    c.   Testing laboratory name, address, and telephone number.

2

d.      Name and signature of laboratory inspector.

e.      Date of time of sampling or inspection.

f.      Record of temperature and weather conditions.

g.      Date of test.

h.      Identification of product and specification section.

i.      Location of sample or test in the project.

j.      Type of inspection or test.

k.      Results of test and compliance or lack thereof with contract documents.

l.      Interpretation of test results, when requested by County or Project Engineer.

The CONSULTANT does not guarantee the performance of the Contractor(s) by inspection, samplings, and tests made by the CONSULTANT. The CONSULTANT'S commitment does not relieve and shall not relieve the Contractor(s) of its/their obligation to perform the work in conformity with the plans and specifications and in a workmanlike manner, and shall not make the CONSULTANT an insurer of the Contractor(s) performance, and shall not impose upon the CONSULTANT any obligation to see that the work is performed in a safe manner. It is understood that the CONSULTANT does not assume any duties or responsibilities to anyone to insure that the Contractor(s) or the Contractor(s)' employees are provided with a safe place to work.

8.      Perform additional tests, quality assurance, and other assistance, as required and requested by the County or the Project Engineer.

9.      The CONSULTANT is not authorized to:

a.      Release, revoke, alter, or enlarge on requirements of the Construction Contract Documents.

b.      Approve or accept any portion of the work.

c.      Perform any duties of the Contractor.

3

SECTION 2 - OBLIGATION OF THE COUNTY TO THE CONSULTANT

It is understood that the COUNTY will:

1.    Assist the CONSULTANT by placing at their disposal all available information pertinent to the project, including previous reports and any other data relative to the condition of the site.

2.    Guarantee legal access to and make all provisions for the CONSULTANT to enter upon public and private lands as required for the CONSULTANT to perform work under this AGREEMENT.

3.    Examine studies, reports, sketches, opinions of probable cost of testing, proposals, and other documents presented by the CONSULTANT, and shall render decisions in writing pertaining thereto within a reasonable time so as not to delay the services of the CONSULTANT.

4.    Give prompt written notice to the CONSULTANT whenever the COUNTY observes, or otherwise becomes aware of, any defect in the performance of engineering services.

SECTION 3 - CONFERENCES AND VISITS TO SITE

A.    Conferences will be held at the request of either the COUNTY or the CONSULTANT to discuss matters pertinent to any phase of the project.

B.    Request for visits to the site may be made by the COUNTY or by the CONSULTANT in conjunction with any other party or parties.

ARTICLE II - TIME OF BEGINNING AND COMPLETION

A.    The CONSULTANT agrees to start work on the professional service outlined under Article I of this AGREEMENT within five (5) days after receipt of written notice from the COUNTY to proceed. The COUNTY will not notify the CONSULTANT to commence work until this AGREEMENT has been formally approved by both parties.

B.    The work to be performed shall be complete in accordance with the following schedule:

4

The scope of work identified in Article I, Section 1 will last through the duration of the construction of sewer rehabilitation construction projects in the Cahaba River and Village Creek Basins, approximately one thousand one hundred (1,100) days or until June, 2001.

C.    In case the COUNTY deems it advisable or necessary in the execution of the work to make any alteration which will increase or decrease the scope of work outlined in this AGREEMENT, the time limits specified herein may be adjusted in accordance with Article IV, Section 1.

## ARTICLE III - PAYMENT

### SECTION 1

For services performed by the CONSULTANT under this AGREEMENT, and as full and complete compensation therefor, including all expenditures made and all expenses incurred by the CONSULTANT in connection with this AGREEMENT, except as otherwise provided herein, subject to and in conformity with all provisions of this AGREEMENT, the COUNTY will pay the CONSULTANT an amount not to exceed One Hundred Fifty Thousand Dollars ($150,000.00), based on work actually performed and with invoicing in accordance with the itemized fee schedule (Attachment 1) which is hereby incorporated as part of this AGREEMENT.  Payment shall be made subject to submission by the CONSULTANT of invoices and evidence of performance as the COUNTY may deem necessary.  Payment shall be made, not more often than once monthly, in such amounts as evidenced by the submittal of vouchers and invoices by the CONSULTANT to the Environmental Services Department of the COUNTY, and other evidence of performance as the COUNTY may deem necessary.  The COUNTY shall make payment to the CONSULTANT within ten (10) days upon receipt of the payment request by the Finance Department.

### SECTION 2

The acceptance by the CONSULTANT of the final payment shall constitute and operate as a release to the COUNTY for all claims and liability to the CONSULTANT, his representative and assigns for all things done, furnished or relating to the service rendered by the CONSULTANT under or in connection with this AGREEMENT or any part thereof provided that no unpaid invoice exist because of extra work required at the request of the COUNTY.

C:\OFFICE\WPWIN\WPDOCS\AGRMNTS\CAHLVIL.WPD

## ARTICLE IV - MISCELLANEOUS PROVISIONS

### SECTION 1 - CHANGES OF WORK

If, during the term of this AGREEMENT, additional services are required of the CONSULTANT other than those specified above, or major changes in the work become necessary or desirable, the COUNTY may order, in writing, the CONSULTANT to perform such services or make such changes. If the CONSULTANT is of the opinion that the work he has been directed to perform is beyond the scope of this AGREEMENT and constitutes extra work, the CONSULTANT will, within ten (10) days, notify the COUNTY in writing and receive approval from the COUNTY prior to performing such work. In the event the COUNTY determines that such work does constitute extra work, additional time for completion of contract may be given and payment for the additional work shall be negotiated by Supplemental Agreement prior to work being undertaken by the CONSULTANT.

Likewise, during the term of this AGREEMENT, any service specified may be deleted and/or reduced at the discretion of the COUNTY. If such deletion or reduction becomes desirable, the CONSULTANT will be given advance notice and an equitable reduction in the CONSULTANT'S fees or cost ceiling will be made on a proportionate basis.

### SECTION 2 - OWNERSHIP OF ENGINEERING DOCUMENTS

Upon completion of the work covered by this AGREEMENT, the CONSULTANT shall make available to the COUNTY all documents and data pertaining to the work or to the project, which material shall become the property of the COUNTY. All original tracings or maps and other engineering data furnished to the COUNTY by the CONSULTANT shall bear thereon the endorsement of the CONSULTANT.

### SECTION 3 - CONSULTANT'S ENDORSEMENT

The CONSULTANT shall endorse the original title or cover sheet of all reports and engineering data required to be furnished by him under the terms of this AGREEMENT. All endorsements shall contain the seal and original signature of an Alabama licensed professional engineer who is a bona fide employee of the CONSULTANT. The original title or cover sheet shall also contain a statement that all surveying was completed in accordance with the requirements of the minimum technical standards for the practice of land surveying in the state of Alabama. The statement shall be signed by a registered land surveyor with his/her Alabama Registration Number duly affixed.

## SECTION 4 - DELAYS AND EXTENSIONS

1.  In the event that unavoidable delays prevent completion of the services to be performed under this AGREEMENT in the time specified in <u>Article II - Time of Beginning and Completion</u>, the COUNTY may grant a time extension to any or all phases of the work, provided written application is made by the CONSULTANT within ten (10) days after the alleged delay has occurred.

2.  In the event that delays are deemed avoidable by the COUNTY and time extensions are not granted, the CONSULTANT may be subjected to a liquidated damages charge of $100.00 per day for each calendar day exceeding the time specified in Article II.

## SECTION 5 - TERMINATION OR ABANDONMENT

1.  The COUNTY shall have the right to abandon this AGREEMENT or to amend the project at any time, and such action shall, in no event, be deemed a breach of contract.

2.  The COUNTY has the right to terminate this AGREEMENT at its pleasure upon ten (10) days written notice and make settlement with the CONSULTANT upon an equitable basis. The value of the work performed by the CONSULTANT prior to the termination of this AGREEMENT shall be determined. In determining the value of the work performed, the COUNTY shall consider the following:

    A.  The ratio of the amount of work performed by the CONSULTANT prior to the termination of the AGREEMENT to the total amount of work contemplated by this AGREEMENT less any payments previously made.

    B.  The amount of the expense incurred by the CONSULTANT in performing the work to the termination in proportion to the amount of expense the CONSULTANT would have incurred had he been allowed to complete the total work contemplated by the AGREEMENT, less any payments previously made. In determining the value of the work performed by the CONSULTANT prior to the termination, no consideration will be given to profit which the CONSULTANT might have made on the uncompleted portion of the work. If the termination is brought about as a result of unsatisfactory performance on the part of the CONSULTANT, the value of the work performed by the CONSULTANT prior to termination shall be fixed solely on the ratio of the amount of work contemplated by this AGREEMENT.

C:\OFFICE\WPWIN\WPDOCS\AGXOOTS\CAN4VIL.WPD

## SECTION 6 - CONTROVERSY

In any controversy concerning a question of fact in connection with the work covered by this AGREEMENT, or compensation therefor, the decision of the Director of Environmental Services in the matter shall be final and conclusive for both parties.

## SECTION 7 - RESPONSIBILITY FOR CLAIMS AND LIABILITY

A.    The CONSULTANT shall be responsible for all damage to life and property due to its activities and that of its subcontractors, agents or employees in connection with its services under this AGREEMENT.  CONSULTANT specifically agrees that its subcontractors, agents or employees shall possess the experience, knowledge and character necessary to qualify them individually for the particular duties they perform.

B.    The CONSULTANT agrees to indemnify, hold harmless and defend the COUNTY, its elected officials, officers and employees (hereinafter referred to in this paragraph collectively as "COUNTY"), from and against any and all loss, expense against or imposed upon COUNTY because of bodily injury, death or property damage, real or personal, including loss of use thereof arising out of or as a consequence of breach of any duty or obligation of the CONSULTANT included in this AGREEMENT, negligent acts, errors or omissions including engineering design even though such injuries or death or damage to property is claimed to be due to the negligent acts, errors or omissions of the CONSULTANT, his subcontractors, the contractor, his subcontractor, the COUNTY, its elected officials, officers or employees.  Nothing contained in this paragraph should be construed to obligate CONSULTANT to indemnify the COUNTY for its own negligence, the negligence of its contractors or subcontractors or others.

C.    CONSULTANT, without extra compensation, shall carry insurance of the kinds and in amounts set out below.  All insurance shall be by companies authorized to do business in Alabama involving those types of insurance.
Before beginning work, CONSULTANT shall file with the COUNTY a certificate from his insurer showing the amounts of insurance carried and the risk covered thereby or a copy of the required insurance policies.

General Liability and Property Damage . . . . . . . $300,000.00

Automobile and Truck Bodily Injury Liability . . $300,000.00

8

The foregoing Indemnity Agreement shall not be limited by reason of any insurance coverage provided.

## SECTION 8 - GENERAL COMPLIANCE WITH LAWS

The CONSULTANT shall comply with the provisions of the Labor Law, all State Laws, Federal and Local Statutes, Ordinances and Regulations that are applicable to the performance of this AGREEMENT, and especially laws, ordinances and statutes prohibiting discrimination in employment of persons on account of race, creed, color, sex, national origin, or disability and all applicable provisions of Title 6, Code of Federal Regulations, and procure all necessary licenses and permits.

## SECTION 9 - SUBLETTING, ASSIGNMENT OF TRANSFER

There shall be no assignment, subletting or transfer of the interests of the CONSULTANT in any of the work covered by this AGREEMENT without written consent of the COUNTY. In the event the COUNTY gives such consent, the terms and conditions of this AGREEMENT shall apply to and bind the party or parties to whom such work is consigned, subject or transferred as fully and completely as the CONSULTANT is hereby bound and obligated.

## SECTION 10 - EMPLOYMENT OF COUNTY WORKERS

1.  The CONSULTANT shall not engage, on full or part time or other basis during the period of the AGREEMENT, any professional or technical personnel who are or have been at any time during the period of this AGREEMENT in the employ of the COUNTY, except regularly retired employees, without written consent of the public employer of such person.

2.  The CONSULTANT warrants that he has not employed or retained any company, or person other than a bona fide employee working solely for the CONSULTANT, to solicit or secure this AGREEMENT, and that he has not paid or agreed to pay any company or person, other than a bona fide employee working solely for the CONSULTANT, any fee, commission, percentage brokerage fee, gifts or any other consideration contingent upon or resulting from the award or making of this AGREEMENT. For breach or violation of this warranty, the COUNTY shall have the right to annul this contract without liability or, at its discretion, deduct from the contract price or consideration or otherwise recover the full amount of such fee, commission, percentage, brokerage fee, gifts or contingent fee.

3.  No COUNTY official, employee of the COUNTY, shall be admitted to any share or part of this AGREEMENT, or to any benefit that may arise therefrom, except the use of the facility being designed as enjoyed by the general public.

C:\OFFICE\WPWIN\WPDOCS\AGRMNTS\CARAVIL.WPD

## SECTION 11 - CONTROL

All work by the CONSULTANT shall be done in a manner satisfactory to the COUNTY and in accordance with the established policies, practices and procedures of the COUNTY.

## SECTION 12 - CONDITIONS AFFECTING WORK

1.  The CONSULTANT shall be responsible for having taken steps reasonably necessary to ascertain the nature, location, scope and type of work hereunder and the general and local conditions which can affect the work or the cost hereof. Any failure by the CONSULTANT to do so will not relieve him from responsibility for successfully performing the work without additional expense to the COUNTY. The COUNTY assumes no responsibility for any understanding or representation by any of its officials or agents prior to the execution of this AGREEMENT, unless such understandings or representation by the COUNTY are expressly stated herein. The CONSULTANT and subcontractor shall maintain all books, documents, papers, accounting records and other evidences pertaining to costs incurred for this project, and to make such material available at their respective offices at all times during the contract period and for three (3) years from the date of final payment of the COUNTY funds under the terms of the contract, for inspection by the COUNTY, or any authorized representative of the COUNTY government, and copies thereof shall be furnished if requested.

2.  During the performance of this contract, the CONSULTANT or itself, its assignees and successors in interest, agree as follows:

    A.  <u>Non-Discrimination</u>:  The CONSULTANT, with regard to the work performed by it after award and prior to completion of the contract work, will not discriminate on the grounds of race, creed, color, sex, national origin, or disability in the selection and detention of subcontractors, including procurement of materials and lease of equipment. The CONSULTANT will not participate either directly or indirectly in the discrimination prohibited by or pursuant to Title VI of the Civil Rights Act of 1964 or the Equal Opportunity Provisions of Executive Order 11246 of September 24, 1965.

    B.  <u>Solicitations of Subcontractor, Including Procurement of Materials and Equipment</u>:

        In all solicitations, either by competitive bidding or negotiations made by CONSULTANT for work to be performed under a subcontract, including procurement of materials or equipment, each potential subcontractor or

C:\OFFICE\WPWIN\WPDOCS\AGMNTS\CAHAVIL.WPD

supplier shall be notified by the CONSULTANT of the CONSULTANT'S obligations under this contract and the regulations relative to nondiscrimination.

C.    <u>Sanctions of Noncompliance</u>:   In the event of the CONSULTANT'S noncompliance with the nondiscrimination provisions of this contract, the COUNTY shall impose such contract sanctions as it may determine to be appropriate, including, but not limited to:

      (1)    Withholding of payments to the CONSULTANT under the contract until the CONSULTANT complies and/or

      (2)    Cancellation, termination or suspension of the contract, in whole or in part.

## ARTICLE V

## SECTION 1 - EXECUTORY CLAUSE

1.    The CONSULTANT specifically agrees that this AGREEMENT shall be deemed executory only to the extent of monies available and no liability shall be incurred by the COUNTY beyond the monies available for that purpose.

2.    The CONSULTANT, in accordance with his status as an independent contractor, covenants and agrees that he will conduct himself in a manner consistent with such status, that he will neither hold himself out as, nor claim to be an officer or employee of the COUNTY by reason hereof, and that he will not, by reason hereof, make any claim, demand or application to or for any right or privilege applicable to any officer or employee of the COUNTY, including, but not limited to, Workmen's Compensation coverage or retirement membership or credit.

## ARTICLE VI

IN WITNESS WHEREOF, the Parties have hereunto affixed their signatures, **PROFESSIONAL SERVICE INDUSTRIES, INC. (PSI)**, on the _____ day of _____ _____, 1998, and the **COUNTY** on the _2e_ day of _May_ , 1998.

**PROFESSIONAL SERVICE INDUSTRIES (PSI), INC.**

Johnny C. Woods
Department Manager

RECOMMENDED:

Jack W. Swann
Jefferson County
Director of Environmental Services

ATTEST:

Minute Clerk

JEFFERSON COUNTY COMMISSION

Mary M. Buckelew, President

12

STATE OF ALABAMA)

JEFFERSON COUNTY)

I, _David G. Nichols_ , a Notary Public in and for said COUNTY in said STATE, do hereby certify that <u>Johnny C. Woods</u>, whose name as **Department Manager of Professional Service Industries (PSI), Inc.**, is signed to the foregoing AGREEMENT and who is known to me, acknowledged before me on this day that, being informed of the contents of this AGREEMENT, he, as such officer and with full authority, executed the same voluntarily.

Given under my hand this _13ᵗʰ_ day of _MAY_ , 1998.

_David G Nichols_
Notary Public

MY COMMISSION EXPIRES MAY 21, 2001

13

### ATTACHMENT 1
### Schedule of Fees
### for
### Metallurgical Laboratory Services
### PSI Proposal Number: 470-98-015

**Manhole Rehab Materials:**

| | |
|---|---|
| Hardness | $ 35.00 |
| Elongation | $ 50.00 |
| Bond Strength | $ 60.00 |
| Density | $ 30.00 |
| Flexural Strength | $220.00 |
| Flexural Modulus of Elasticity | $ 35.00 |
| Tensile Strength | $230.00 |
| Shrinkage | (Later) |

**Polyester Resin Felt Liner:**

| | |
|---|---|
| Flexural Strength | $220.00 |
| Flexural Modulus of Elasticity | $ 35.00 |
| Tensile Strength | $230.00 |

**Additional Rates:**

| | |
|---|---|
| Technician (QA Services), per hour | $ 35.00 |
| Pick Up of Samples, per hour | $ 25.00 |
| Mileage, per mile | $ 0.40 |
| Project Manager, per hour | $ 45.00 |
| Project Engineer, per hour | $ 75.00 |



# JEFFERSON COUNTY, ALABAMA

BIRMINGHAM, ALABAMA 35263-0009

## CONTRACT PURCHASE ORDER

ORD[ER]

125377

CHA[N]GE

DATE 6/5/98

VENDOR NO: 19514

### Instructions

SHOW THE ABOVE CONTRACT PURCHASE ORDER NUMBER AND VENDOR NUMBER ON ALL INVOICE RECEIPTS, PACKAGES, CORRESPONDENCE ETC.

Vendor Name

Professional Services Industries, Inc.
Suite 204
1025 South 23rd Street
Birmingham, Alabama 35205

And

Address

**JEFFERSON COUNTY COMMISSION**
Finance Department
Room 304-B Courthouse
Birmingham, Alabama 35263-0033

| FD | ORG/DIV | OBJECT | SEC | UNIT | PROJECT | GRANT | TERMS | CONTRACT DATE | COMMISSION APPROVAL DA[TE] | AMOUNT |
|----|---------|--------|-----|------|---------|-------|-------|---------------|---------------------------|--------|
| 34 | 7357 | 55371 | 00 | 00 | 1C50J | | N10/Finance Dept's Receipt of Pay Request | 5/20/98 | 5/20/98 | $150,000.00 |

| CODE | DESCRIPTION |
|------|-------------|
| SHORT DESCRIPTION 25 SPACES | Cahaba River and Village Creek SSCS Rehab |
| | Environmental Services |

**DESCRIPTION:** Agreement for Construction Materials Testing
Cahaba River and Village Creek Sanitary Sewer Collections

**COMPENSATION:** Based upon work actually performed and in accordance with the itemized fee schedule incorporated as part of the Agreement.

MINUTE BOOK: 121    PG: 32-37

| VOUCHER NO | FINAL Y/N | N |
| INVOICE DATE | PAY DATE | |

NO OVERAGES WILL BE ACCEPTED

| | TOTAL | $150,000.00 |
|---|-------|-------------|
| DELETED | AMOUNT | $1.00 |

NET CHANGE